STATE OF NORTH CAROLINA v. RICKY CARLTON EXUM

No. COA97-377

(Filed 3 March 1998)

1. **Evidence and Witnesses § 876 (NCI4th)— murder—statements of victim—fear of defendant—admissible**

    The trial court did not err in a first-degree murder and assault prosecution by admitting statements by the victim to her sister that she was afraid of defendant. Although defendant contended that the statements were residual hearsay and should not have

---

1. A facility is defined in N.C. Gen. Stat. § 122C-3(14).

been admitted without a determination of sufficient indicia of reliability, the statements fall squarely within the state of mind exception. The testimony was relevant because it relates to the victim's relationship with defendant immediately preceding her death and factual events are not excluded where the facts serve to demonstrate the basis for the emotions. N.C.G.S. § 8C-1, Rule 803(3).

**2. Jury § 194 (NCI4th)— jury selection—defense counsel's brother-in-law—excusal for cause—no abuse of discretion**

There was no abuse of discretion in the excusal for cause of a juror where the defense counsel was the juror's brother-in-law. This relationship could impede a juror's ability to render a fair and impartial verdict; additionally the State retained unused peremptory challenges.

Appeal by defendant from judgments dated 3 October 1996 by Judge James D. Llewellyn in Greene County Superior Court. Heard in the Court of Appeals 7 January 1998.

*Attorney General Michael F. Easley, by Assistant Attorney General John J. Aldridge, III, for the State.*

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender Janine Crawley Fodor, for defendant appellant.*

GREENE, Judge.

Ricky Carlton Exum (Defendant) appeals entry of a judgment on a jury verdict finding him guilty of first degree murder and assault with a deadly weapon inflicting serious injury.

Defendant and the victim were married and had four children (sixteen-year-old Kisha, fifteen-year-old Vicki, eleven-year-old Ricky, Jr., and three-year-old Randy) at the time of the victim's murder. Testimony at trial revealed that Defendant had beaten the victim on numerous occasions in the past. Approximately five years before her death, the victim met and subsequently began a regular affair with Aquilla Blount (Blount), a friend of the family. Approximately three months prior to her death, the victim and Blount were attacked by Defendant during daylight hours at Speight Bridge. As a result of this attack, Blount, the victim, and Randy (who was with his mother at the time), had to be treated at the hospital for the injuries they received. Following this attack, the victim took her children and went to a bat-

STATE v. EXUM

[128 N.C. App. 647 (1998)]

tered women's shelter (the Shelter) instead of returning to the marital home. The victim's sister, Mary Wooten (Wooten) visited the victim several times while she was staying at the Shelter, and was allowed to testify, without any objection from Defendant, to the following conversation between herself and the victim while the victim was residing at the Shelter:

> [The victim] said it had got to the point that she knew that she was just going to have to leave or he was going to have to leave or something. Because she said at that point he acted like he was trying to kill her the way he was hitting at her at the bridge that time. She said that she could tell that if he could have really got to her like he was trying to that day that he probably would have killed her that day.

When the victim was ready to leave the Shelter, Wooten drove her and the children to Wooten's home, where they remained for a few days. The victim and her children then moved into the home of the victim's parents.

On 15 June 1993, while continuing to reside at her parents' home, the victim was attacked by Defendant in her parents' yard. Wooten was allowed to testify, again without any objection from Defendant, to the following conversation between herself and the victim:

> Q: What did [the victim] tell you happened while she was staying at her parents' house?
>
> A: She said one morning she—everybody had left . . . and she was there by herself.
>
> And she said she walked out in the garden . . . and he came running out from behind a tobacco barn. And they got to—they got to arguing at that time. And she said at that time that's when he—that was the time he almost strangled her to death.
>
> Q: Did she ever show you any marks or bruises about her body when she was telling you this?
>
> A: Yes. She had—like all around her neck you could tell that he had had a hold of her because there were marks all around her neck and up under here. Under here somewhere it was like a flesh wound. You could see the meat around her neck. (Indicating.)

Q: When your sister was telling you about this . . . could you describe how she was acting?

A: She was acting—shaky voice, chills. Like, fearful.

Q: Did she say anything about [Defendant] when she was telling you this?

A: She was saying like [Defendant] was just mean. She said she don't know where he popped up from that early in the morning and everybody had just left the house. She said he's just mean. He's just mean. I believe he's trying to kill me. I know he is.

The police responded to a call regarding this attack, and the victim went to the police station that day, 15 June 1993, and spoke to the sheriff about the attack. The sheriff testified that "[the victim] conveyed to me that she was scared [Defendant] was going to kill her." The sheriff instructed the victim to take out a warrant against Defendant. The victim obtained a warrant against Defendant for assault on 15 June 1993, and a deputy testified that he attempted to serve the warrant but could not find Defendant. The deputy did notify Defendant's mother, who testified that Defendant had lived with her for some time preceding the murder, that a warrant for Defendant's arrest for assault had been issued. On Friday, 25 June 1993, the original date scheduled for a hearing on the assault charge, Defendant appeared voluntarily at the sheriff's department to have the warrant served. Defendant signed a written promise to appear in court on the following Friday, 2 July 1993, regarding the assault charge. Defendant spoke to the sheriff after his arrest and release on bail for the assault charge, and the sheriff conveyed to Defendant the victim's fear of Defendant, requested that Defendant not return to the marital home, and suggested that Defendant "seek counsel for visitation with his children in a separation." Defendant related to the sheriff his concerns over the affair between the victim and Blount, and agreed not to go to the marital home.

The victim had appeared in court that same morning, 25 June 1993, pursuant to the scheduled hearing date on the assault warrant. Defendant, who was not served with the warrant until he appeared at the sheriff's department that afternoon, did not appear for court. After leaving the courthouse that day, the victim spoke with Wooten, and Wooten was allowed to testify at trial over Defendant's objection to her conversation that evening with the victim, as follows:

Q: Did your sister [the victim] talk to you, [Wooten,] about coming to court the Friday before she was killed?

A: Uh-huh. (Yes.)

Q: What did she tell you about that?

. . . .

A: [The victim] was saying that . . . [Defendant] didn't come or something, but then they said he showed up in court later and they just let him out on bond.

She was saying that it seemed like every time they would ever even go to court, it would be the same thing. He would be out. He just like slipped through—I mean, he would be out and right back doing the same thing.

And she said it seemed like every time he would go in and out, he would beat her worse than what he would do before. It would be worse on her for even taking out a warrant on him.

. . . .

Q: When was the last time you talked to [the victim] before she died?

A: It was that—I think it was that Saturday morning or that Friday—no. It was that Friday evening, I think. I know I talked with her after she came out of court that Friday evening. I think that was the last time.

Q: Did you talk to her in person or over the phone?

A: No, it was in person. Because she was telling me about—I think it was in person because she was telling me about he didn't come to court that morning. She said I was sitting in there and he weren't even there.

. . . .

Q: And did [the victim] tell you anything else about [Defendant] other than what you've just testified about during that last conversation with her?

A: No, not that I can remember. She was just saying that he didn't show up for court. And she didn't know what had happened because they were supposed to have went to court that morning.

Q: During that last conversation you had with [the victim], . . . did [she] tell you how she felt toward [Defendant]?

A: She was saying that she didn't never want to go back to him no more.

Q: Did she tell you why she felt that way?

A: Because she was afraid of him. She felt like he was trying to kill her.

Either that night or during the next day, Saturday, the victim and her children returned to the marital home, apparently for the first time since Defendant's attack at Speight's Bridge. On Sunday morning, 27 June 1993, Defendant appeared at the marital home at 8:00 a.m. The three eldest children testified that Defendant and the victim were talking loudly or arguing in the kitchen about the victim "[taking Defendant] to court that Friday," a "court paper," and about the victim's affair with Blount. Defendant followed the victim out into the yard, and the three eldest children heard their mother scream and ran outside to investigate. Vicki testified that she saw her mother "getting up off the ground brushing herself off." Defendant then reached into his sock and removed a long-bladed knife. Vicki testified that she ran back into the house at this point to call the police. Vicki testified that the 911 operator who answered "told me to calm down because they couldn't hear me, hear what I was saying, so I hung up the phone on them. And I had to end up calling them back." Ricky, Jr. testified that he ran outside when he heard "somebody holler." He saw his mother brushing herself off. The victim then "looked up and saw the knife and then she took off running." Kisha testified that "I just heard mama hollering and I ran outside." Kisha saw Defendant take a knife out of his sock and saw her mother run behind the barn, with Defendant following her. "And after she got to the barn, she fell in a hole." Defendant caught up with the victim at this point and began stabbing her with the knife. The children repeatedly yelled to their father to stop, but Defendant told the children "ya'll better move." The victim was able to get up and get away from Defendant and to run back to the house and into her bedroom. Defendant followed her, as did the children, and when the children arrived in the bedroom, Defendant was "holding [the victim] by the top of her head" and stabbing her. At one point the knife fell to the floor and Kisha attempted to pick it up before Defendant did. Defendant pulled the knife from Kisha's hands, severely cutting Kisha's fingers. Kisha subsequently had hand surgery, but testified at trial that she still could not bend her fingers.

After Defendant regained possession of the knife, the three eldest children managed to push Defendant into a corner, and were "trying to hold him . . . pushing him back." Defendant told the children "to move; get out of the way." The victim attempted to stand up and run from the room at this point, and Defendant "reached over all of us [children] and stabbed her in her neck . . . and a whole lot of blood came out of her neck." Ricky, Jr. testified that he and his mother ran from the bedroom and back outside, and once back in the yard his mother "started staggering everywhere and then she had fell down." Kisha and Vicki testified that Defendant then left the house, stepped over the victim and said, "Die Bitch" as he walked away. Vicki testified that she asked her father "why did he do that . . . why did he do it?" as he was walking away, and he responded that "[the victim] was messing around on him."

During jury selection, a juror was excused for cause by the trial court because the defense counsel was the juror's brother-in-law. At trial, Defendant's counsel argued before the jury that Defendant did stab the victim to death, but contended that Defendant did so without premeditation or deliberation. Judgments were entered on the jury's determination that Defendant was guilty of first degree murder, for which Defendant was sentenced to life imprisonment, and of assault with a deadly weapon inflicting serious injury, for which Defendant was sentenced to ten additional years. Defendant appeals these judgments.

The issues are whether: (I) the victim's fact-laden statements fall within the Rule 803(3) hearsay exception for statements of the declarant's then-existing state of mind; and (II) excusing a juror for cause due to his relationship with defense counsel was error.

I

[1] Defendant contends that statements made by the victim to her sister, Wooten, were Rule 804(b)(5) residual hearsay, and therefore could not be admitted absent a determination by the trial judge that the testimony bore sufficient indicia of reliability. *See State v. Triplett*, 316 N.C. 1, 8, 340 S.E.2d 736, 740 (1986) (requiring a six-part inquiry as to the admissibility of residual hearsay). The State contends, however, and we agree, that the statements fall squarely within N.C. Gen. Stat. § 8C-1, Rule 803(3), and therefore required no *Triplett* findings for admissibility. *See State v. Rogers*, 109 N.C. App. 491, 499, 428 S.E.2d 220, 225, *cert. denied*, 334 N.C. 625, 435 S.E.2d 348 (1993),

*cert. denied,* 511 U.S. 1008, 128 L. Ed. 2d 54, *reh'g denied,* 511 U.S. 1102, 128 L. Ed. 2d 495 (1994) ("Our Courts also have held that statements admissible under a traditional, or "firmly rooted," hearsay exception are deemed inherently trustworthy . . . .").

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," N.C.G.S. § 8C-1, Rule 801(c) (1992), and "is not admissible except as provided by statute or by the North Carolina Rules of Evidence," *State v. Wilson,* 322 N.C. 117, 131-32, 367 S.E.2d 589, 598 (1988). Rule 803(3) of the Rules of Evidence allows for admission of hearsay testimony if it "tend[s] to show the victim's [then-existing] state of mind . . . ." *State v. Bishop,* 346 N.C. 365, 379, 488 S.E.2d 769, 776 (1997). Our Supreme Court has stated that the underlying policy supporting Rule 803(3) is the "fair necessity, for lack of other better evidence, for resorting to a person's own contemporary statements of his mental or physical condition . . . ." *State v. Hardy,* 339 N.C. 207, 229, 451 S.E.2d 600, 612 (1994) (holding that the victim's written statements "express[ed] no emotion" and were therefore inadmissible). Statements merely relating factual events do not fall within Rule 803(3) because, in contrast to statements of mental or physical condition, factual circumstances are provable by better evidence, such as the testimony of those who witnessed the events. *Id.* The victim's statements relating factual events that tend to show the victim's state of mind when making the statements, however, are not excluded from the coverage of Rule 803(3) where the facts related "serve . . . to demonstrate the basis for the [victim's] emotions." *State v. Gray,* 347 N.C. 143, 173, 491 S.E.2d 538, 550 (1997) (explaining that the Court in *Hardy* found the victim's statements inadmissible because they were "totally without emotion"). *Cf. State v. Alston,* 307 N.C. 321, 328, 298 S.E.2d 631, 637 (1983) (deciding under common law principles prior to the adoption of the Rules of Evidence that "the naked assertion by a victim prior to his death that he fears the defendant should not be admitted into evidence absent some evidence tending to show a factual basis for such alleged fear"). The determination that fact-laden statements are not excluded from the coverage of Rule 803(3) where they tend to show the speaker's then-existing state of mind is further supported by the federal courts' interpretation of federal rule 803(3).[1]

---

1. Federal rule 803(3) and our Rule 803(3) are identically worded. *See* Fed. R. Evid. 803(3) and N.C.G.S. § 8C-1, Rule 803(3) (1992).

In the first place, it is in the nature of things that statements shedding light on the speaker's state of mind usually allude to acts, events, or conditions in the world, in the sense of making some kind of direct or indirect claim about them. . . .

In the second place, fact-laden statements are usually deliberate expressions of some state of mind. . . . [I]t does not take a rocket scientist . . . to understand that fact-laden statements are usually purposeful expressions of some state of mind, or to figure out that ordinary statements in ordinary settings usually carry ordinary meaning. In the end, most fact-laden statements intentionally convey something about state of mind, and if a statement conveys the mental state that the proponent seeks to prove, it fits the [federal rule 803(3)] exception.

4 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 438, p. 417-18 (2d ed. 1994) (explaining why federal courts prefer a broad reading of federal rule 803(3)).

In this case, the victim's sister, Wooten, was allowed to testify, over Defendant's objection, about a conversation she had with the victim after the victim returned from court on the Friday before her death. Wooten testified that the victim told her that Defendant had not shown up for court, and that it seemed to the victim that "every time they would ever even go to court, it would be the same thing . . . he just like slipped through . . . [and the victim] said it seemed like every time he would go in and out, he would beat her worse than what he would do before." During the same conversation, the victim stated to Wooten that she was "afraid" of Defendant. This testimony "tend[ed] to show" the victim's fear and frustration at the time of the conversation, and the attendant factual circumstances described by the victim served only to demonstrate the basis for these emotions.

Wooten was also allowed to testify that, while visiting the victim at the Shelter,

[the victim] said at that point [Defendant] acted like he was trying to kill her the way he was hitting at her at the bridge that time. She said that she could tell that if he could have really got to her like he was trying to that day that he probably would have killed her that day.

This testimony was admitted without any objection from Defendant, but Defendant contends that its admission without findings as to reliability amounts to plain error. These statements, however, especially

viewed in light of the fact that the victim had moved from Defendant's home and into a battered women's shelter following the incident described, tended to show the victim's then-existing fear of Defendant. *See State v. Mixion*, 110 N.C. App. 138, 148, 429 S.E.2d 363, 368 (1993) (holding that it was not necessary that the victim explicitly state that she was afraid, so long as the "scope of the conversation . . . related directly to [the victim's] existing state of mind and emotional condition"); *State v. Lynch*, 327 N.C. 210, 221, 393 S.E.2d 811, 817 (1990) (victim's statements admissible under Rule 803(3) where witness testified that she could tell the victim was frightened because "[s]he had fear in her voice").

Finally, Wooten testified as to a conversation she had with the victim after the victim left the Shelter and moved in with her parents. The victim told Wooten that Defendant had attacked her in her parents' garden and Defendant had "almost strangled her to death." Wooten testified that while they talked, the victim "was acting— shaky voice, chills. Like, fearful." Finally, the victim told Wooten during this conversation that Defendant "was just mean. She said she don't know where he popped up from that early in the morning and everybody had just left the house. She said he's just mean. He's just mean. I believe he's trying to kill me. I know he is." Defendant contends that this testimony, which was admitted without *Triplett* findings absent any objection, likewise amounts to plain error. This conversation between Wooten and the victim, however, "tend[ed] to show" the victim's fear of Defendant at the time of the conversation. The additional facts elicited during the conversation were merely surrounding factual circumstances serving "to demonstrate the basis" for the victim's fear. *Gray*, 347 N.C. at 173, 491 S.E.2d at 550.

For admission under Rule 803(3), the state of mind testimony must also be relevant to the issues in the case. *Bishop*, 346 N.C. at 379, 488 S.E.2d at 776. Here, the victim's state of mind during each of the three conversations at issue is relevant because it relates to her relationship with Defendant immediately preceding her death. *See State v. Scott*, 343 N.C. 313, 335, 471 S.E.2d 605, 618 (1996) ("It is well established in North Carolina that a murder victim's statements falling within the state of mind exception to the hearsay rule are highly relevant to show the status of the victim's relationship to the defendant."). Wooten's testimony as to the victim's statements during each of the above conversations falls within a "firmly rooted" hearsay exception, Rule 803(3), and the court was therefore not required to make *Triplett* findings as to the reliability of these statements.

STATE v. EXUM

[128 N.C. App. 647 (1998)]

## II

**[2]** Defendant also contends that a juror was improperly excused for cause by the court, and he should therefore receive a new trial. We disagree.

"A defendant is not entitled to any particular juror. His right to challenge is not a right to select but to reject a juror." *State v. Harris*, 338 N.C. 211, 227, 449 S.E.2d 462, 470 (1994). N.C. Gen. Stat. § 15A-1212 lists grounds for the automatic disqualification of a juror, and provides for a challenge for cause on the ground that the juror "[f]or any other cause is unable to render a fair and impartial verdict." N.C.G.S. § 15A-1212(9) (1997). A juror's fitness to serve "is a matter within the sound discretion of the trial court and will not be disturbed absent a showing of abuse of discretion." *State v. Abraham*, 338 N.C. 315, 343, 451 S.E.2d 131, 145 (1994). *See also State v. Jones*, 339 N.C. 114, 143-44, 451 S.E.2d 826, 481 (1994), *cert. denied*, — U.S.—, 132 L. Ed. 2d 873, *reh'g denied*, — U.S. —, 132 L. Ed. 2d 913 (1995) ("[A] trial judge's decision to excuse a juror . . . is entitled to deference because 'there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.' "). Additionally, where the State retains peremptory challenges at the end of jury selection, even the improper excusal of a juror for cause is generally not reversible error. *See Harris*, 338 N.C. at 227, 449 S.E.2d at 470.

In this case, a juror was excused for cause because the defense counsel was his brother-in-law. This relationship could impede a juror's ability "to render a fair and impartial verdict." It was therefore not an abuse of the trial court's discretion to excuse this juror for cause. In addition, the State retained unused peremptory challenges at the end of jury selection.

No error.

Judges JOHN and MARTIN, Mark D., concur.