STATE OF NORTH CAROLINA v. STEPHEN CLAY JONES, SR.

No. COA99-437

(Filed 4 April 2000)

**1. Evidence— hearsay—homicide victim's statements about defendant**

There was no plain error in the first-degree murder prosecution of a husband for shooting his wife as she slept in the admission of her statements about his jealousy and threats to kill her. Her statements were arguably no more than recitations of fact; however, the facts she recited were admissible under N.C.G.S. § 8C-1, Rule 803(3) as tending to show her state of mind as to her marriage, were relevant under Rule 402 to show her relationship with defendant, and rebutted testimony by defendant that they had a good marriage.

STATE v. JONES

[137 N.C. App. 221 (2000)]

**2. Constitutional Law— confrontation clause—hearsay**

The admission of a homicide victim's statements about defendant did not violate defendant's rights under the Confrontation Clause of the Sixth Amendment. Hearsay does not violate the Confrontation Clause if it bears adequate indicia of reliability and reliability can be inferred without more if the hearsay falls within a firmly rooted exception to the hearsay rule.

**3. Evidence— telephone calls—identification of caller**

There was no plain error in a first-degree murder prosecution where the trial court admitted hearsay evidence of defendant's telephone calls to the victim's workplace. The State failed to properly authenticate the calls because the witnesses did not recognize defendant's voice and simply accepted the caller's self-identification, but the calls were rarely more than to see if the victim was at work and the witnesses only once heard anything even approaching a threatening remark. Moreover, defendant offered evidence of an alternate caller.

**4. Criminal Law— automatism—instructions**

There was no plain error in a first-degree murder prosecution where the trial court instructed the jury that the burden of proof for the affirmative defense of unconsciousness or automatism lay with defendant. Although defendant argued that this instruction required him to disprove the existence of a voluntary act, a required element of first-degree murder and its lesser included offenses, defendant was only required to overcome the presumption that a person is conscious when he acts as if he were conscious. Unlike *Mullaney v. Wilbur*, 421 U.S. 684, the instructions here did not relieve the State of the burden of proving all of the essential elements of first-degree murder or its lesser included offenses.

**5. Evidence— character—victim**

There was no plain error in a first-degree murder prosecution where the State introduced evidence of the victim's good character before defendant offered any evidence of her character, but defendant did not object at trial and testified on cross-examination that the victim was the good person others believed her to be. Defendant's decision to offer the same evidence he now objects to negates any claim of error he might otherwise have supported.

**6. Constitutional Law— effective assistance of counsel**

A first-degree murder defendant was not denied the effective assistance of counsel where, taken as a whole, defendant's attorney's performance was not so deficient as to render his service ineffective. He thoroughly cross-examined witnesses and presented evidence that contradicted the State's evidence, he objected to the admission of evidence, and the trial transcript indicates that he was well prepared and alert. The failures to object cited by defendant involved evidence which was admissible, an instruction which was without error, and errors which were corrected by defendant's own evidence. The one failure to object which was not corrected by defendant's evidence was slight and did not result in prejudice to defendant.

Appeal by defendant from judgment entered 4 August 1998 by Judge George L. Wainwright, Jr. in Superior Court, Craven County. Heard in the Court of Appeals 17 February 2000.

*Michael F. Easley, Attorney General, by Francis W. Crawley, Special Deputy Attorney General, for the State.*

*Office of the Appellate Defender, by Anne M. Gomez, Assistant Appellate Defender, and Malcolm Ray Hunter, Jr., Appellate Defender, for the defendant-appellant.*

WYNN, Judge.

This appeal arises from the defendant's conviction of first degree murder of his wife. He presents several issues challenging the fairness of his trial including the admission of hearsay evidence, an instruction to the jury on the defense of unconsciousness or automatism, the admission of character evidence and the ineffective assistance of his counsel. We find no prejudicial error in his conviction.

Stephen Clay Jones, Sr. and Frances Riggs Jones were married for 23 years. Up until Ms. Jones' death, they lived with their two children in New Bern, North Carolina.

After an assailant attacked Frances at her home in 1985, she kept four guns—one in her purse, one in her car, one in her dresser, and one .38 caliber pistol under her bed pillow.

The couple awakened early on the morning of 8 June 1997 and Frances cut Stephen's hair. They went out to breakfast, shopped, and visited the grave of Frances' sister. They returned home, relaxed, and

had sexual relations in their bed. Frances showered and the couple took an afternoon nap together in their bed.

According to Stephen, a loud bang woke him up and he found a gun lying next to his face and Frances bleeding. He called 911 crying and telling the operator he had just shot his wife and she needed an ambulance. He said that he did not remember shooting his wife and if he did so, he did not do it deliberately.

Responding to the 911 call, police officers arrived at the Jones' home. Stephen came outside, crying and still holding the phone. He put the phone down and got on the ground as soon as the officers told him to do so.

The police officers found Frances on the right side of her bed. She lay flat on her back with her arms straight down at her sides. Her feet touched the end of the bed and her nightgown was bunched up under her buttocks. Her head lay partially on the pillow, facing right, but blood stains on the pillow failed to help the investigators determine whether Frances was shot lying down. The pillow partially covered the .38 caliber pistol, which had one fired casing and five live rounds. The police officers found a .38 caliber bullet lodged in the window facing next to and above the bed but the bullet was too damaged to determine if it had been fired from the .38 caliber pistol found under the pillow.

Forensic residue tests on Frances' and Stephen's hands were inconclusive as to whether either had recently fired a gun. An autopsy revealed that a bullet entered Frances' skull behind her left ear and exited behind her right ear. The bullet passed through her brain, instantly killing her. The gun fired the bullet six to twelve inches away from her head, but the pathologist could not determine Frances' position at the time of the shooting.

Stephen's evidence at trial showed that Frances could have been lying down when shot from close range. The State's evidence showed that she could have been shot while sitting up.

The State and Stephen presented conflicting testimony at trial as to the nature of the couple's marital relationship. Several State witnesses testified that a man identifying himself as Stephen Jones made several phone calls to Frances' place of employment during the six weeks before her death—usually asking whether Frances was at work, and on occasion, talking to Frances.

Frances' coworkers described her as well-liked, friendly, and hard-working. Some of her coworkers revealed conversations with Frances in the weeks before her death in which she said that she had a jealous husband who had threatened to kill her many times. Some coworkers also testified that on a few occasions, Frances would not let anyone walk her to her car after work, saying that her husband might be waiting for her in the parking lot.

The State also presented evidence that Frances may have had a cut on her mouth. Witnesses for the defendant testified otherwise.

In his testimony, Stephen described Frances as friendly, hard-working, and honest. He revealed a year-long extra-marital affair in 1985, but stated that he had been faithful for a long time and Frances forgave him. He testified that he rarely visited or called Frances' workplace, and that he made no phone calls there between 1 May and 8 June 1997. His cellular phone records showed no calls placed to Frances' workplace during that period.

Stephen also presented telephone records showing that Michael Godwin, a former employee at Frances' workplace, made 41 calls to the mill and eight more to the Jones' residence during May and June 1997. One of Frances' coworkers testified that she had once spent a couple of hours talking to Godwin on the phone. Godwin himself did not testify since he could not be found and subpoenaed.

Jack Jones, the couple's 17-year-old son, testified that he had never seen his parents argue or fight; that he had never seen his father hit his mother; and that Frances had a fever blister on her mouth but no other injuries.

Dr. Rodney Radtke testified that after Frances' death, he diagnosed Stephen as suffering from REM Sleep Disorder—a condition where normal muscle relaxation fails during the dream stage of sleep and the sleeper acts out his dreams. The sleeper usually vividly recollects his REM Sleep Disorder dreams, but not always. Typical behavior while sleeping can include kicking, fighting, cussing, dragging a person down the stairs, and trying to break a person's neck. Dr. Radtke testified that a person with REM Sleep Disorder could fire a gun while asleep, especially if the gun was easily accessible. He based Stephen's diagnosis on his sleep habits aside from the shooting incident.

The defendant's evidence showed that he suffered REM Sleep Disorder episodes anywhere from two-to-three times a year to two-to-

three times a month. On various occasions while sleeping, he kicked and damaged a wall, kicked a bedpost, squeezed and grabbed his wife and put his hand over her mouth, jumped out of bed and ran into a wall, and beat and scratched himself. While in the county jail after his arrest in this case, Stephen's cell mate watched him dive into the cell door while asleep, and twice had to restrain him from running in his sleep.

Dr. Radtke speculated that since Stephen had only an eighth grade education, he could not have read about REM Sleep Disorder and faked the symptoms. Further, Dr. Radtke testified that if Stephen was making up his symptoms, he probably would have claimed to "remember" a dream about shooting a gun.

At the close of all evidence, the trial court instructed the jury on the charges of first degree murder, second degree murder, and involuntary manslaughter. The court also instructed the jury about the affirmative defense of unconsciousness or automatism. The jury found the defendant guilty of first degree murder and the trial judge sentenced him to imprisonment for life without parole. The defendant appealed.

I.

[1] The defendant first argues that the trial court erred by admitting irrelevant and highly prejudicial hearsay evidence concerning his alleged jealousy and threats to kill his wife. We disagree.

Because the defendant did not object at trial to any of the evidence complained of in this assignment of error, we review this issue under the plain error standard of review. N.C.R. App. P. 10(b)(1), *State v. Odom*, 307 N.C. 655, 656, 300 S.E.2d 357, 376 (1983). Plain error is an error which was "so fundamental as to amount to a miscarriage of justice or which probably resulted in the jury reaching a different verdict than it otherwise would have reached." *State v. Bagley*, 321 N.C. 201, 213, 362 S.E.2d 244, 251 (1987), *cert. denied*, 485 U.S. 1036, 99 L. Ed. 2d 912 (1988). To prevail under a plain error analysis, a defendant must establish not only that the trial court committed error, but that absent the error, the jury probably would have reached a different result. *See State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993).

The defendant argues that the trial court erroneously allowed the State to introduce under N.C.R. Evid. 803(3)—the state-of-mind exception to the hearsay rule—numerous statements made by

Frances to several coworkers that he was a jealous man and had repeatedly threatened to kill her. He contends that these statements were inadmissible hearsay and also violated his right to confront the witnesses against him.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.R. Evid. 801(c). Generally, hearsay is not admissible. N.C.R. Evid. 802. However, numerous exceptions to this rule exist, including Rule 803(3) which allows admission of a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition . . . but not including a statement of memory or belief to prove the fact remembered or believed . . . ." Such a statement must also be relevant to a fact at issue in the case (Rule 402) and its probative value must not be substantially outweighed by its prejudicial impact (Rule 403). *See State v. Cummings*, 326 N.C. 298, 313, 389 S.E.2d 66, 74 (1990).

In this case, the defendant argues that Frances' statements concerning his alleged jealousy and threats to kill her should not have been admitted because the statements were recitations of remembered facts and not statements about her existing state of mind, emotions, sensation, or physical condition. But our courts have repeatedly found admissible under Rule 803(3) a declarant's statements of fact that indicate her state of mind, even if they do not explicitly contain an accompanying statement of the declarant's state of mind.

Indeed, most recently, in the case of *State v. Brown*, 350 N.C. 193, 513 S.E.2d 57 (1999), our Supreme Court held that a decedent's factual statements about the status of his marriage exposed how he felt about the marriage and were therefore state-of-mind statements, despite the fact that he did not explicitly state how he felt about the situation. The Court also held that the statements corroborated a possible motive for the defendant's act of murder. *Accord State v. Payne*, 327 N.C. 194, 394 S.E.2d 158 (1990), *cert. denied*, 498 U.S. 1092, 112 L. Ed. 2d 1062 (1991). Moreover, the decedent's statements in *Brown* rebutted testimony by the defendant that her marriage to the victim was a happy marriage. Rebuttal testimony needs no special rule to allow its admission. *See State v. Lambert*, 341 N.C. 36, 49, 460 S.E.2d 123, 131 (1995).

Earlier, in *State v. Mixion*, 110 N.C. App. 138, 429 S.E.2d 363, *review denied*, 334 N.C. 437, 433 S.E.2d 183 (1993), we held that state-

ments about feelings need not accompany statements of fact to be admissible under Rule 803(3). In *Mixion*, the decedent made statements that the defendant harassed her and threatened her, but she did not express fear or any other emotion. These statements, although entirely factual, in effect showed the decedent's state of mind when she uttered them and were therefore admissible under Rule 803(3). *See also State v. Exum*, 128 N.C. App. 647, 655, 497 S.E.2d 98, 103 (1998) (holding that fact-laden statements are usually purposeful expressions of some state of mind and are therefore admissible under Rule 803(3)). And the factual statements by the decedent in *Mixion* were relevant to the case because they related directly to the decedent's relationship with the defendant. *Accord Exum; State v. Scott*, 343 N.C. 313, 335, 471 S.E.2d 605, 618 (1996) (holding that: "It is well established in North Carolina that a murder victim's statements falling within the state of mind exception to the hearsay rule are highly relevant to show the status of the victim's relationship to the defendant.")

In this case, Frances' statements that her husband was jealous and had repeatedly threatened to kill her were arguably no more than recitations of fact. However, the facts that she recited tended to show her state of mind as to her marriage and were therefore admissible under Rule 803(3). *See Brown, supra; Exum, supra;* and *Mixion, supra.* Further, since her statements indicated her relationship with the defendant, they were relevant under Rule 403. *See Exum, supra.* Finally, the statements rebutted testimony by the defendant that they had a good marriage and were therefore admissible for that reason. *See Brown* and *Lambert, supra.*

[2] The defendant also argues that admitting Frances' statements violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution. We disagree.

Hearsay does not violate the Confrontation Clause of the Sixth Amendment if it bears adequate indicia of reliability. *See Ohio v. Roberts,* 448 U.S. 56, 66, 65 L. Ed. 2d 597, 608 (1980). Reliability can be inferred without more if the hearsay falls within a firmly rooted exception to the hearsay rule. *See id.* In North Carolina, the state-of-mind exception to the hearsay rule is a firmly rooted exception. *See, e.g., State v. Jackson,* 348 N.C. 644, 654, 503 S.E.2d 101, 107 (1998); *State v. Stager,* 329 N.C. 278, 318, 406 S.E.2d 876, 899 (1991); *State v. Faucette,* 326 N.C. 676, 684, 392 S.E.2d 71, 75 (1990). The defendant's argument that the statements in the case at bar, admitted

under the state-of-mind exception, violated the Confrontation Clause is without merit.

## II.

[3] The defendant next argues that the trial court erred by admitting inadmissible and highly prejudicial hearsay evidence of defendant's alleged phone calls to the sawmill—Frances' workplace.

Before a witness may testify as to a telephone conversation, the witness must identify the person with whom he spoke. *See State v. Richards*, 294 N.C. 474, 480, 242 S.E.2d 844, 849 (1978). If the call was from a person whose identity is in question, it is not enough that the caller identify himself by name; rather, the witness must have recognized the caller's voice or otherwise identified him by circumstantial evidence. *See id.*

At trial, the State presented evidence showing that a man who identified himself as Stephen Jones repeatedly called Frances at her place of work during the six weeks before her death. The State failed to properly authenticate the calls in accordance with *Richards* because the witnesses who testified about these phone calls did not recognize his voice; instead, they simply accepted the caller's self-identification. Since the State failed to properly authenticate the phone calls, they were inadmissible under Rule 901. But because the defendant failed to object to the admission of the phone call evidence at trial, we consider this error under the plain error standard and determine whether the admission of this evidence caused the jury to reach a result it would not have reached otherwise. *See Odom, supra.*

The record on appeal shows that the phone calls, while frequent, were rarely more than a call to see if Frances was at work. Occasionally, the caller talked to Frances, but only once did the witnesses hear anything even approaching a threatening remark—when the speaker was told that Frances was at work and he responded "better hope she is." Also, the defendant offered evidence showing that a former coworker, Michael Godwin, had called Frances' workplace 41 times in the weeks before her death. This evidence helped negate any damaging impact the phone call evidence might have had by offering an alternate caller for the jury to consider. In light of this evidence, we believe that the phone call evidence was not so influential or inflammatory that it resulted in the jury reaching a verdict it would otherwise not have reached.

III.

**[4]** Next, the defendant argues that the trial court erred by instructing the jury that the burden was on the defendant to establish the defense of unconsciousness or automatism. The defendant contends that North Carolina's pattern jury instructions on unconsciousness are unconstitutional under recent United States Supreme Court cases. We disagree.

The defendant himself offered to the trial court the unconsciousness instruction and he obviously did not object to the instruction he offered. We therefore review this assignment of error for plain error only. *See Odom, supra.*

The trial court instructed the jury that if the defendant did not shoot his wife voluntarily because of unconsciousness or automatism, then he was not guilty of any offense. The trial court put the burden of proving unconsciousness or automatism on the defendant. The trial court also instructed the jury on the elements of first degree murder, second degree murder, and involuntary manslaughter, and properly instructed the jury that the burden of proving the defendant's intent was on the State.

In North Carolina, when a person commits an act without being conscious of it, the act is not a criminal act even though it would be a crime if it had been committed by a person who was conscious. *See State v. Jerrett,* 309 N.C. 239, 264, 307 S.E.2d 339, 353 (1983). Unconsciousness is a complete defense to a criminal charge because it precludes both a specific mental state and a voluntary act. *See id.* at 264-65, 307 S.E.2d at 353. Significantly, unconsciousness is an affirmative defense and the burden is on the defendant to prove its existence to the jury. *See id.* at 265, 307 S.E.2d at 353; *State v. Caddell,* 287 N.C. 266, 290, 215 S.E.2d 348, 363 (1975).

The undisputed evidence in this case shows that the defendant and his wife were alone when she was shot, and that he stated during his 911 call that he shot her. Because the gravamen of the evidence showed that the defendant did in fact shoot his wife, his guilt rested upon the State's proof that he acted intentionally. The defendant contends that the jury instruction on automatism constituted plain error because it shifted the burden of proving voluntariness away from the State and instead made him *disprove* that he acted voluntarily.

To support his argument that the jury instructions improperly shifted the burden of disproving an essential element of the State's

case to him, the defendant relies on *Mullaney v. Wilbur*, 421 U.S. 684, 44 L. Ed. 2d 508 (1975). In that case, a Maine jury instruction required a defendant in a murder trial to prove that he acted in the heat of passion, as opposed to deliberately and with malice aforethought. In effect, the burden of proof shifted away from the State and to the defendant to prove the defendant's mental state at the time of the crime. The United States Supreme Court held that it was unconstitutional for a state to require a defendant to negate a required element of an offense. *See id.* at 704, 44 L. Ed. 2d at 522.

In this case, the defendant asserts that the jury instructions on unconsciousness or automatism required him to *disprove* the existence of a "voluntary act," a required element of first degree murder and its lesser-included offenses. We hold, however, that the issue in this case is distinguishable from the issue in *Mullaney*.

Under *Mullaney*, the state carries the burden of proving a defendant's culpable state of mind at the time of a crime and the defendant does *not* have the burden of *disproving* a culpable state of mind. However, *Mullaney* did *not* address who has the burden of proof for affirmative defenses, which is the issue before us today. Unlike in *Mullaney*, the jury instructions in this case did not relieve the State of the burden of proving all of the essential elements of first degree murder or its lesser-included offenses. The State still had to carry its burden of proof; otherwise, the jury had to find the defendant not guilty. The jury instructions only placed on the defendant the burden of proving his affirmative defense. *See State v. Blair*, 101 N.C. App. 653, 657, 401 S.E.2d 102, 105 (1991). This affirmative defense did not shift the burden of proving or disproving the elements of the crime; rather, this shift only required the defendant to overcome the presumption that a person is conscious when he acts as if he were conscious. *See Caddell*, 287 N.C. at 298, 215 S.E.2d at 368.

The trial court properly instructed the jury that the burden of proof for the affirmative defense of unconsciousness or automatism lay with the defendant. Since this assignment of error is without merit, we need not address the State's argument that the defendant was not entitled to the jury instruction on unconsciousness.

IV.

[5] The defendant next argues that the trial court erred by allowing the State to present evidence of Frances' good character where he had not presented evidence calling her character into question.

At trial, several witnesses for the State testified as to Frances' good character. They testified that she was well-liked, friendly, treated people well and worked hard. Later, during the defendant's cross-examination, the defendant himself offered testimony that his wife was friendly, honest and a hard worker.

Evidence concerning the victim's character is inadmissible unless it is offered to rebut evidence offered by the defendant. N.C.R. Evid. 404(a)(2). In this case, the State offered evidence of Frances' good character *before* the defendant offered any evidence of her character. The trial court erred when it admitted that evidence. But again the defendant did not preserve this issue for appeal by objecting at trial and we must therefore review the error to determine whether it made the jury reach a verdict it would not otherwise have reached. *See Odom, supra.*

The defendant argues that the admission of the character evidence rose to the level of plain error because the evidence did nothing besides elicit sympathy for the victim. However, after the State introduced evidence of Frances' good character, the defendant himself testified on cross-examination that Frances was the good person that others believed her to be. The defendant's decision to offer the same evidence he now objects to negates any claim of error he might otherwise have supported. The admission of evidence without objection (such as the defendant's own testimony) waives *prior or subsequent* objection to the admission of evidence of a similar character. *See State v. Campbell,* 296 N.C. 394, 399, 250 S.E.2d 228, 231 (1979). Indeed, our Supreme Court has held that a defendant's decision to introduce character evidence is a tactical decision that will not support an assignment of error on appeal. *See Brown,* 350 N.C. at 206, 513 S.E.2d at 65.

We hold that the admission of the evidence concerning Frances' good character was not plain error.

V.

[6] Finally, the defendant argues that he was denied the effective assistance of counsel at trial. We disagree.

To prove ineffective assistance of counsel, the defendant must show that his attorney's performance was deficient and that the deficient performance prejudiced the defendant. *See Strickland v. Washington,* 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693 (1984); *State v. Sanderson,* 346 N.C. 669, 684-85, 488 S.E.2d 133, 141 (1997). To pre-

vail on such a claim, the defendant must show that his "counsel's performance fell below an objective standard of reasonableness" and that "counsel's errors were so serious as to deprive defendant of a fair trial, a trial whose result is reliable." *State v. Moorman*, 320 N.C. 387, 399, 358 S.E.2d 502, 510 (1987).

The defendant argues that his attorney's performance was deficient due to the many times his attorney failed to object to evidence presented by the State. He contends that his attorney should have objected to Frances' statements concerning his threats and jealousy, the phone call evidence, evidence of Frances' good character, and the unconsciousness instruction. The defendant also points out that because his attorney did not object to these events at trial, he must now argue under the more stringent plain error standard of review on appeal. Finally, the defendant asserts that "there could be no conceivable strategic or tactical reason to not make these objections."

We have already reviewed the defendant's assignments of error and determined that two of them are without merit. Frances' statements about his jealousy and threats were admissible. Any objection to the admission of this evidence would have been permissibly overruled. Likewise, we found no error in the jury instruction about unconsciousness and thus, an objection to it would have been properly overruled. The admission of evidence of Frances' good character was in error, but the defendant corrected that error when he offered similar testimony during his own cross-examination. On these three points, the attorney's conduct was not deficient.

Only the phone call evidence was both inadmissible and not corrected by the defendant's own evidence. However, the record indicates other evidence, aside from the phone calls, that the jury could have based its verdict on. In addition, the defendant offered evidence that the phone calls were made by another person. This evidence would have reduced some of alleged prejudice of the phone call evidence. Moreover, under the facts of this case, the evidence fails to show that the admission of the phone calls was so damaging to the defendant's case that the jury found him guilty solely because of them. Even assuming that the defendant's attorney erred in not objecting to the admission of the phone calls, this one deficiency of performance was slight and did not result in prejudice to the defendant.

Further, taken as a whole, the defendant's attorney's performance was not so deficient as to render his service "ineffective." He

throughly cross-examined witnesses and presented evidence that contradicted the State's evidence concerning the defendant's alleged threats and jealousy and the phone calls to the mill. He objected to the admission of other evidence and testimony. The trial transcript indicates that he was well-prepared and alert. His performance was far from "ineffective."

We hold that the defendant's argument that he was denied the effective assistance of counsel is without merit.

No prejudicial error.

Judges MARTIN and HUNTER concur.