STATE OF NORTH CAROLINA v. MAECHEL SHAWN PATTERSON

No. COA00-484

(Filed 18 September 2001)

## 1. Confessions and Incriminating Statements— motion to suppress—voluntariness—custody

The trial court did not err in a first-degree murder case by denying defendant's motion to suppress statements he made to State Bureau of Investigation Special Agents at the Pitt County Mental Health Center and a diagram defendant drew for the agents with a note describing his involvement in the victim's death, because: (1) the agents did not promise, threaten, or coerce defendant into making his statements; (2) defendant appeared coherent in his responses to the agents' questions; (3) defendant had an opportunity to confer privately with his sisters prior to making his statements; (3) defendant told the agents he had not taken any drugs in the last twenty-four hours; (4) defendant was in voluntary commitment at the Detox Center and could leave if he so desired; (5) the agents were granted permission by the supervisor at the Detox Center to speak to defendant prior to questioning him; (6) defendant had voluntarily agreed to speak to the agents about the victim's death; and (7) defendant was not in custody or restrained in any way and was told that he could end the interview at any time by telling the agents he wished to stop.

## 2. Evidence— opinion testimony—confession—not under influence of drugs, narcotics, or alcohol

The trial court did not err in a first-degree murder case by allowing an S.B.I. agent to testify that defendant did not appear to be under the influence of drugs, narcotics, or alcohol or any other controlled substance when defendant spoke to agents at the Pitt County Detox Center about the victim's death, because: (1) a lay person may give his opinion as to whether a person is under the influence of an intoxicating substance so long as that opinion is based on the witness's personal observation; (2) a police officer is allowed to give his opinion of the defendant's mental capacities at the time of a confession; and (3) it was necessary for the agent in this case to give his opinion as to defendant's mental state at the time of the confession to help with the determination that defendant voluntarily gave the statement to police.

**3. Evidence— first-degree murder—photographs of victim's body**

The trial court did not abuse its discretion in a first-degree murder case by allowing the State to introduce into evidence eight photographs of the victim's body, because: (1) none of the photographs were particularly gruesome or inflammatory; and (2) all of the photographs were relevant to illustrate the testimony of the State's witnesses and were not excessive or repetitious.

**4. Evidence— hearsay—state-of-mind exception—relevancy**

The trial court did not err in a first-degree murder case by admitting hearsay evidence of the victim's statements tending to show that defendant did not like the fact that the victim would not allow defendant to move in with him, because: (1) the evidence was admitted under N.C.G.S. § 8C-1, Rule 803(3) to demonstrate the victim's state of mind as to his relationship with defendant; (2) the statements were relevant under N.C.G.S. § 8C-1, Rule 402 to shed light on the victim's relationship with defendant; and (3) the statements rebutted defendant's claim in his confession that he and the victim were not having any type of disagreement or argument prior to the night of the victim's death.

**5. Homicide— first-degree murder—premeditation and deliberation—malice—sufficiency of evidence**

The trial court did not err by denying defendant's motion to dismiss the charge of first-degree murder based on malice, premeditation, and deliberation because the evidence taken in the light most favorable to the State reveals that: (1) defendant stabbed the victim in the back with a sword and, upon realizing that the victim would die, stabbed the victim again; (2) prior to leaving the victim's home, defendant removed his fingerprints from the sword and every other object he had touched while in the victim's home, and took some marijuana and a smoking pipe belonging to the victim; (3) there was no evidence the victim provoked the stabbing; and (4) defendant and the victim had been involved in a homosexual relationship for several years and the victim had recently rejected defendant's request to move in with the victim, which angered and upset defendant.

**6. Homicide— first-degree murder—felony murder—robbery—sufficiency of evidence**

The trial court did not err by denying defendant's motion to dismiss the charge of first-degree murder based on felony murder with robbery serving as the underlying felony, because: (1)

defendant's confessions that he stabbed the victim in the back and stabbed the victim again after realizing he would die, and that he took the victim's marijuana and smoking pipe, were corroborated by substantial independent evidence; and (2) a reasonable juror could infer that defendant's murder and subsequent robbery of the victim were all part of one transaction.

## 7. Homicide— first-degree murder—failure to submit voluntary manslaughter

The trial court did not err in a first-degree murder case by failing to submit the lesser included offense of voluntary manslaughter, because the jury's finding of premeditation, deliberation, and malice required for a first-degree murder conviction precludes the possibility that the same jury would find defendant guilty of a lesser manslaughter charge.

## 8. Criminal Law— prosecutor's argument—equating members of jury to the State of North Carolina

The trial court did not commit plain error in a first-degree murder case by failing to intervene ex mero motu when the prosecutor during his closing argument equated members of the jury to the State of North Carolina, because it is proper to urge the jury to act as the voice and conscience of the community.

Judge GREENE concurring in the result.

Appeal by defendant from judgment and commitment entered 28 October 1999 by Judge Carl L. Tilghman in Beaufort County Superior Court. Heard in the Court of Appeals 17 April 2001.

*Attorney General Michael F. Easley, by Special Deputy Attorney General Francis W. Crawley, for the State.*

*McCotter, McAfee & Ashton, PLLC, by Rudolph A. Ashton, III, and Kirby H. Smith, III, for defendant-appellant.*

CAMPBELL, Judge.

Defendant, Maechel Shawn Patterson, was indicted for first degree murder on 7 December 1998 in the death of Bobby Wayne Andrews, Jr. ("the victim"). Defendant was tried non-capitally and found guilty of first degree murder on the basis of premeditation and deliberation and under the felony murder rule. On 28 October 1999, the trial court sentenced defendant to life in prison.

The State introduced into evidence defendant's confession, which tended to show that defendant and the victim had been involved in a homosexual relationship for several years prior to the victim's death. On the afternoon of 30 September 1998, defendant visited the victim's residence on the corner of Wharton Street, in Washington, North Carolina. The victim had told defendant he was welcome to stop by at anytime. When defendant arrived at the victim's residence, the victim was eating a sandwich. Defendant did not join him, because defendant had been using crack cocaine that day and was not hungry. Defendant left the victim's house between 5:00 and 6:00 p.m. with plants that the victim had given him.

After leaving the victim's house, defendant drove by the home of Chris Elks ("Elks"). Elks was not home, so defendant went to visit John and Denise Tufte ("the Tuftes"), to whom defendant was trying to sell an insurance policy. Defendant ate supper with the Tuftes, the Tuftes purchased and signed for an insurance policy from defendant, and defendant left around 10:30 p.m. Defendant then went back to Elks' house, where defendant claims the two of them shared one-sixteenth of an ounce of crack cocaine. Elks denied sharing crack cocaine with defendant on 30 September 1998, but corroborated that defendant had visited him on that night.

Defendant left Elks' house and returned home between 1:00 and 2:00 a.m. Defendant lay down for an hour-and-a-half, but was unable to sleep. Defendant left his house and returned to the victim's house between 4:00 and 4:30 a.m. Defendant knocked on the front door, the victim let him in, and the two of them went back to the victim's bedroom. The victim got back into bed, while defendant sat on the floor and smoked some marijuana that belonged to the victim.

Around 5:00 a.m., the victim's alarm went off and both men reached up to cut it off. The victim then lay back down. Defendant, knowing the victim had to be at work at Lowe's at around 6:00 a.m., grabbed a cane from the corner of the bedroom and began poking the victim in the back and telling him to wake up. Defendant was aware that the cane he had grabbed contained a sword on the inside. As defendant poked the victim, the cover came off the end of the cane and defendant stuck the sword into the victim's back. Realizing he had stuck the sword through the victim's body, defendant immediately pulled it out. The victim sat up, faced defendant, and asked, "What the f—k are you doing?" Defendant, realizing the victim was going to die, stabbed him again, this time in the chest. The victim fell back onto the bed, making noises but unable to speak.

Defendant then picked up a towel and wiped down the cane and the sword to remove his fingerprints. Defendant also wiped down the front doorknob and anything else he thought he had touched while in the house. He then laid the sword and the cane on the floor at the foot of the bed. After removing his fingerprints from everything he had touched, defendant took the the box of marijuana and smoking pipe he had been using, both of which belonged to the victim, and returned to his own home around 5:30 a.m. Defendant did not call EMS or try to help the victim in any way prior to leaving the victim's house.

The State also introduced the following evidence which tended to corroborate defendant's confession: Evelyn Respess ("Respess"), who had known the victim for ten years and was being paid to clean his house once each month, called the victim's house several times on the evening of 30 September 1998 and the morning of 1 October 1998. The victim's phone line was continuously busy, which worried Respess, because she knew the victim had telephone call-waiting. Respess drove to the victim's house on the morning of 1 October 1998, knocked on the door and rang the doorbell, but received no answer. Respess then let herself in, walked back to the victim's bedroom, and discovered the victim's dead body. The telephone was off the hook and a sharp object lay at the foot of the bed. Respess called 911 from her car phone and the police responded. Respess further testified that she knew defendant and that she also knew that the victim was a homosexual.

J.T. Sheppard ("Sheppard") testified that while visiting Ronald Dando, who lived next door to the victim, on 30 September 1998 between 5:00 and 5:30 p.m., he observed defendant carrying plants from the victim's house and placing them in his white pickup truck, which Sheppard had seen parked at the victim's house on several occasions. Sheppard also saw defendant's truck at the victim's house late that evening, but testified that it was not there at 7:00 a.m. on the morning of 1 October 1998.

Ronald Dando ("Dando") testified that he saw defendant's truck parked at the victim's house when he returned home late on 30 September 1998. Dando also testified that he observed the headlights of a vehicle backing out of the victim's driveway between 4:30 and 5:00 a.m. on 1 October 1998. A vehicle returned a short time later, but did not stay very long.

Denise Tufte testified that defendant came to her house around 9:15 p.m. on 30 September 1998, stayed for dinner, and sold the Tuftes

**STATE v. PATTERSON**

[146 N.C. App. 113 (2001)]

an insurance policy. Defendant did not appear unusual or act like he was under the influence of anything that evening. Before leaving around 10:15 p.m., defendant told the Tuftes that he was not selling much insurance and the lack of income was causing stress in his marriage. According to Mr. Tufte, defendant returned a week or two later trying to sell some coins and mentioned that he was the suspect in a murder case. Defendant also told the Tuftes that he had a cocaine problem and that he needed treatment.

Chris Elks testified that defendant was at his house until 11:30 or 12:00 on the night of 30 September 1998, but that the two of them did not use cocaine. Elks also testified that defendant was at his house on 2 October 1998 when a news report about the victim's death was shown on the television. Defendant stated, "I was just at the guy's [victim's] house." Defendant also told Elks that the victim had given him some plants and had promised to give him an entertainment center.

Dr. Thomas Clark, III, associate chief medical examiner for the State of North Carolina and a forensic pathologist, performed the autopsy on the victim, which revealed a shallow stab wound to the left side of the victim's chest and a deeper stab wound to the left side of the victim's back. This wound to the back, which Dr. Clark determined to be the cause of death, ran through the victim's left lung and aorta, under his right lung, and into his liver. Dr. Clark testified that the sword found in the victim's bedroom could have caused the victim's wounds, and that the wounds could have been inflicted by someone seated on the floor. Dr. Clark's autopsy also revealed a hairline fracture of the seventh rib, which Dr. Clark believed could have occurred near the time of death. In Dr. Clark's opinion, the victim's wounds were intentionally inflicted. Additional evidence will be set forth hereinafter where pertinent.

At the close of the State's evidence, defendant moved to dismiss the first degree murder charge. This motion was denied. Defendant chose not to introduce any evidence, and renewed his motion to dismiss, which was again denied.

On appeal to this Court, defendant makes several arguments. After reviewing the record, transcript, briefs, and oral arguments of counsel, we conclude that defendant received a fair trial, free from prejudicial error.

STATE v. PATTERSON

[146 N.C. App. 113 (2001)]

I.

[1] Defendant first argues that the trial court erred in denying his motion to suppress statements he made to State Bureau of Investigation ("SBI") Special Agents Kelly Moser ("Moser") and Phil Brinkley ("Brinkley") (collectively, "the agents") at the Pitt County Mental Health Center on 9 October 1998. Defendant also assigns error to the admission of a drawing he made in connection with his statements to the agents. An evidentiary hearing on defendant's motion to suppress was held during a recess in jury selection on 25 October 1999. The next day, in open court, the trial court denied defendant's motion to suppress. On appeal, defendant argues that his statements should have been excluded from evidence because they were made while defendant was subjected to custodial interrogation and had not been advised of his *Miranda* rights. Defendant also contends the statements were not voluntary.

Following the evidentiary hearing, the trial court made detailed findings of fact with regard to defendant's interview with Agents Moser and Brinkley, which we summarize: At approximately 7:00 p.m. on 9 October 1998, Agents Moser and Brinkley went to the Pitt County Mental Health Detox Facility looking for defendant. Upon arrival, the agents saw defendant sitting outside, smoking and talking with other patients. The agents went inside the facility, identified themselves, and learned from the supervisor on duty that defendant was there by voluntary commitment. The supervisor advised defendant that the agents were there to talk with him, and defendant agreed to speak with the agents. The agents and defendant entered a small conference room, where defendant was told he could stop the agents' questioning and leave the room at anytime. Defendant was advised that the agents were not there to arrest him, and defendant was not restrained in any way. The agents advised defendant that they were there to get any information he may have about the death of the victim, Bobby Wayne Andrews, Jr., so that they could relay defendant's side of the story to the district attorney so the district attorney could decide how to handle the case. The agents advised defendant that they could make no promises to him related to the handling of the case. The agents did not advise defendant of his *Miranda* rights. Defendant told the agents he had voluntarily committed himself earlier that day and that he had not taken any drugs in the last twenty-four hours. Defendant made statements about not wanting to go to jail, not having any intent, and wanting treatment for his drug problem.

During the interview, defendant's sisters came into the room and told defendant he should not be talking with the agents. Defendant left the interview room with his sisters, but told the agents that he wanted them to wait for him in the parking lot. Defendant talked to his sisters in his private room at the facility, then went out to the parking lot, where he made his statements to the agents and drew a diagram and wrote a note describing his involvement in the victim's death. His sisters were present in the parking lot when defendant made his statements. According to the agents, defendant did not appear to be under the influence of any drug or narcotics. Defendant was not arrested after giving his statement. There were no threats, promises, or coercion on the part of Agents Moser and Brinkley. The agents did not inquire of any staff person at the Detox Center as to defendant's physical or mental condition, proceeding only on their personal observations of defendant. Based on these findings of fact, the trial court concluded that defendant's statements were given in a non-custodial interview.

The trial court also made findings of fact concerning whether defendant's statements were voluntary. Specifically, the trial court found that the agents did not promise, threaten, or coerce defendant into making his statements; defendant appeared coherent in his responses to the agents' questions; defendant had an opportunity to confer privately with his sisters prior to making his statements; defendant told the agents he had not taken any drugs in the last twenty-four hours; defendant was in voluntary commitment at the Detox Center and could leave if he so desired; and the agents were granted permission by the supervisor at the Detox Center to speak to defendant prior to questioning him. Based on these findings of fact, the trial court concluded that defendant's statements were voluntary. The trial court therefore denied defendant's motion to suppress.

"It is well established that the standard of review in evaluating a trial court's ruling on a motion to suppress is that the trial court's findings of fact " 'are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting.' " " *State v. Buchanan,* 353 N.C. 332, 336, 543 S.E.2d 823, 826 (2001) (quoting *State v. Brewington,* 352 N.C. 489, 498, 532 S.E.2d 496, 501 (2000), *cert. denied,* —— U.S. ——, 148 L. Ed. 2d 992 (2001) (citations omitted)). However, the determination of whether a defendant was in custody, based on those findings of fact, is a question of law that is fully reviewable by this Court. *State v. Briggs,* 137 N.C. App. 125, 128, 526 S.E.2d 678, 680 (2000). Likewise, a trial court's conclusion that a

defendant's statements were voluntary is a conclusion of law that is fully reviewable on appeal. *State v. Hardy*, 339 N.C. 207, 222, 451 S.E.2d 600, 608 (1994).

It is well established that *Miranda* warnings are required only when a defendant is subjected to custodial interrogation. *State v. Gaines*, 345 N.C. 647, 661, 483 S.E.2d 396, 404, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997). In *Miranda*, the United States Supreme Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706 (1966). "[T]he appropriate inquiry in determining whether a defendant is 'in custody' for purposes of *Miranda* is, based on the totality of the circumstances, whether there was a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.' " *Buchanan*, 353 N.C. at 339, 543 S.E.2d at 828 (quoting *State v. Gaines*, 345 N.C. 647, 662, 483 S.E.2d 396, 405, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997).

Our review of the record, in its entirety, reflects that defendant had voluntarily committed himself to the Pitt County Mental Health Center, and voluntarily agreed to speak with SBI Agents Moser and Brinkley about the death of Bobby Wayne Andrews, Jr. Defendant was told that the agents had no intention of arresting him, and that they were only there to get his side of the story concerning what happened to the victim so that it could be relayed to the district attorney for a decision on how to handle the case. Defendant was not restrained in any way, and was told that he could end the interview at anytime by telling the agents he wished to stop and simply walking out of the examination room. Defendant informed the agents that he had voluntarily committed himself earlier that day, and that he had not used drugs in the last twenty-four hours. Defendant did not appear to be under the influence of any drugs at that time.

After being asked by the agents to give his side of the story, defendant responded, "It didn't matter how you looked at it, either way, it was still murder." The agents reiterated to defendant that they would not know what the charges would be until his side of the story was relayed to the district attorney, so a decision could be made on what, if any, charges there would be. During the questioning, defendant asked the agents several times whether it would be possible for him to serve any jail time he received in a treatment facility. The agents told defendant those decisions were up to the district attorney

and that they could not give defendant any promises regarding where any jail time would be spent.

Defendant's questioning was interrupted when defendant left the interview room and went to his private room to talk with his sisters. Defendant told the agents as he exited the interview room that he would be back shortly to continue talking with them. When defendant returned to the interview room, he asked the agents if they could come back the following morning. The agents told defendant they could not come back and that they wished he would tell them the truth so that it could be relayed to the district attorney as soon as possible. The agents once again explained to defendant that he did not have to make any statement, and that they just wanted his side of the story so that it could be relayed to the district attorney for a decision on what, if any, charges were to be filed.

After five or ten minutes, defendant's sisters again entered the interview room, and defendant again left with them. Defendant told the agents to wait for him in the parking lot of the facility, and that his sisters would be gone soon. The agents went outside and waited on defendant approximately fifty yards from the front door of the facility. After about twenty minutes, defendant came out to the parking lot, and again asked about the possibility of serving time in a treatment facility. The agents again stated they could make no promises regarding charges and sentencing. After a few minutes passed, defendant told the agents he would tell them the truth. At that time, one of defendant's sisters asked if he should contact a lawyer first. Agent Moser explained that defendant would have to make that decision himself. Defendant was asked if he wanted his sisters present while he explained what happened, and defendant said that was fine. Defendant then told the agents it was an accident and began explaining how he had stabbed the victim. At this time, defendant indicated he wanted a soft drink, so Agent Brinkley went to the store to buy defendant a drink. While Agent Brinkley was gone, defendant explained to Agent Moser in detail what had happened on the night of the victim's death. During the questioning, defendant never requested a lawyer.

Based on the foregoing, we conclude that the record contains ample competent evidence to support the trial court's findings of fact. We also conclude that the evidence does not indicate that defendant's freedom of movement was restrained in any way to the degree associated with a formal arrest. Defendant had voluntarily committed himself to the Detox Center, was told by the agents that he was free

to leave at anytime, and volunteered to meet the agents in the parking lot of the facility, where his statements were given. Therefore, we hold that the trial court correctly determined that, under the totality of the circumstances, defendant was not in custody when he made his statements to Agent Moser, and *Miranda* warnings were not required. We now consider whether defendant's statements were voluntary.

In determining whether a defendant's confession was voluntary and " 'the product of an essentially free and unconstrained choice by its maker,' " we also examine "the totality of the circumstances." *State v. Hardy*, 339 N.C. 207, 222, 451 S.E.2d 600, 608 (1994) (quoting *Schneckcloth v. Bustamonte*, 412 U.S. 218, 225, 36 L. Ed. 2d 854, 862 (1973) (citation omitted). Factors to be considered in this inquiry include:

> whether defendant was in custody, whether he was deceived, whether his Miranda rights were honored, whether he was held incommunicado, the length of the interrogation, whether there were physical threats or shows of violence, whether promises were made to obtain the confession, the familiarity of the declarant with the criminal justice system, and the mental condition of the declarant.

*Id.* Defendant's age and the deprivation of food or sleep may also be considered. *See Schneckcloth*, 412 U.S. at 226, 36 L. Ed. 2d at 862.

Applying these principles to the case at hand, we conclude that the trial court correctly concluded that defendant's confession was voluntary. The trial court found as fact that defendant had voluntarily committed himself to the Detox Center. Defendant was not placed in custody prior to, during, or after the interview. Defendant was told he was free to leave at anytime and defendant was not restrained in any way. Defendant appeared coherent in his responses to the agents' questions, and defendant specifically told the agents he had not used drugs in the last twenty-four hours. The agents wore civilian clothes and displayed no weapons. Defendant had an opportunity to confer privately with his sisters prior to making his statements to the agents. The agents did not promise, threaten, or coerce defendant in any way. These findings are supported by competent evidence in the record.

Defendant argues that during the course of questioning Agent Moser made statements that contained implicit promises of leniency

or escape from prosecution which gave defendant hope of a lighter punishment if defendant confessed. The record reflects that Agent Moser stated the following during his conversation with defendant:

> I explained to him [the defendant] that we would not know exactly what any charges would be until he explained his side of the story so that that could be relayed to the D.A.'s office, to the district attorney, so that a good decision could be made on what if any charges there would be in the case.

Defendant contends that *State v. Pruitt*, 286 N.C. 442, 212 S.E.2d 92 (1975), is controlling in light of this comment and compels the conclusion that defendant's confession was the product of a hope of benefit from confessing and, therefore, not freely and voluntarily given. We disagree.

In *Pruitt*, the investigating officers "repeatedly told defendant that they knew that he had committed the crime and that his story had too many holes in it; that he was 'lying' and that they did not want to 'fool around.' " *Pruitt*, 286 N.C. at 458, 212 S.E.2d at 102. They also told him that they "considered [him] the type of person 'that such a thing would prey heavily upon' and that he would be 'relieved to get it off his chest.' " *Id.* The Court found that under these circumstances the defendant's confessions "were made under the influence of fear or hope, or both, growing out of the language and acts of those who held him in custody." *Id.* at 458, 212 S.E.2d at 102-03. We find the facts in *Pruitt* distinguishable from those in the instant case, and, therefore, we do not consider *Pruitt* controlling.

We agree with defendant that Agent Moser's statement "what if any charges there would be in the case" taken in isolation could be interpreted to contain an implicit promise that defendant would be treated more favorably if he confessed to the murder. However, taken in context, it does not mandate a conclusion that defendant's statements were coerced. We note that defendant asked the agents on several occasions if he would be able to serve any jail time he received in a treatment facility. The agents repeatedly explained to defendant that they could not make any promises regarding charges or sentencing, and that all they could do was relay defendant's side of the story to the district attorney. We find that the agents' repeated assertions that they could make defendant no promises in regard to sentencing leads to the conclusion that defendant was not led to believe that the criminal justice system would treat him more favorably if he confessed to the murder.

Looking to the totality of the circumstances, we conclude that defendant's statements were "the product of an essentially free and unconstrained choice by its maker." *Schneckcloth*, 412 U.S. at 225, 36 L. Ed. 2d at 862. However, we deem it appropriate to reiterate Justice Mitchell's statement for our Supreme Court in *State v. Branch*, 306 N.C. 101, 291 S.E.2d 653 (1982):

> We caution the law enforcement officers of the State . . . that they should always be circumspect in any comment they make to a defendant, particularly in connection with any confession the defendant is to give or has given. The better practice would be for law enforcement officers not to engage in speculation of any form with regard to what will happen if the defendant confesses.

*Branch*, 306 N.C. at 110, 291 S.E.2d at 659-60.

Having concluded that the trial court was correct in its determination that defendant was not in custody when his statements were given, and that defendant's statements were voluntary, we overrule this assignment of error.

## II.

[2] Defendant next argues that the trial court erred in allowing Agent Moser to testify that defendant did not appear to be under the influence of drugs, narcotics, alcohol or any other controlled substance when defendant spoke to the agents at the Pitt County Detox Center. Specifically, defendant argues that this opinion testimony lacked a sufficient foundation and was not rationally based on the observations of the witness. We do not agree.

On *voir dire*, Agent Moser twice answered in the negative when asked whether during the interview defendant appeared to be under the influence of drugs, narcotics, alcohol, or any other controlled substance. At trial, Agent Moser was again asked the question and again responded in the negative. Based on the following, we conclude the trial court properly admitted Agent Moser's opinion testimony.

The rule concerning admissibility of opinion testimony by lay witnesses provides:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

N.C. Gen. Stat. § 8C-1, Rule 701 (1999). Additionally, it is a well-settled rule that a lay person may give his opinion as to whether a person is under the influence of an intoxicating substance so long as that opinion is based on the witness' personal observation. *State v. Lindley*, 286 N.C. 255, 258, 210 S.E.2d 207, 209 (1974). Likewise, a police officer is allowed to give his opinion of the defendant's mental capacities at the time of a confession. *State v. Jones*, 342 N.C. 523, 467 S.E.2d 12 (1996).

In the instant case, Agent Moser not only observed defendant outside the Detox Center talking to other individuals, but also conducted a face-to-face interview with defendant both inside the interview room and outside in the parking lot of the facility. Agent Moser was able to describe defendant's actions and responses to questions over an extended period of time. Defendant explained to Agent Moser that he understood he did not have to speak with the agents if he so chose. Defendant also told the agents that he had not taken any drugs in the last twenty-four hours. These facts are sufficient to support the conclusion that Agent Moser's opinion that defendant was not under the influence of a controlled substance at the time of his confession was rationally based on Agent Moser's perception of defendant at the time of the confession. "Furthermore, it was necessary that he give his opinion as to defendant's mental state at the time of the confession to help determine a crucial fact in issue, that is, that defendant voluntarily gave the statement to police." *Id.* at 538, 467 S.E.2d at 21. Therefore, this assignment of error is overruled.

III.

**[3]** Defendant next argues that the trial court erred in allowing the State to introduce into evidence photographs of the victim's body, in that they were repetitious, prejudicial, and inflammatory.

"Whether to admit photographic evidence requires the trial court to weigh the probative value of the photographs against the danger of unfair prejudice to defendant." *State v. Gregory*, 340 N.C. 365, 387, 459 S.E.2d 638, 650 (1995), *cert. denied*, 517 U.S. 1108, 134 L. Ed. 2d 478 (1996); N.C. Gen. Stat. § 8C-1, Rule 403 (1999). "This determination lies within the sound discretion of the trial court, and the trial court's ruling should not be overturned on appeal unless the ruling was 'so arbitrary that it could not have been the result of a reasoned decision.' " *Id.* (quoting *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988)).

" 'Photographs are usually competent to be used by a witness to explain or illustrate anything that it is competent for him to describe in words.' " *State v. Watson,* 310 N.C. 384, 397, 312 S.E.2d 448, 457 (1984) (quoting *State v. Cutshall,* 278 N.C. 334, 347, 180 S.E.2d 745, 753 (1971)). "Photographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitive use is not aimed solely at arousing the passions of the jury." *State v. Hennis,* 323 N.C. 279, 284, 372 S.E.2d 523, 526 (1988).

Over defendant's objection, the State introduced eight photographs showing all or a portion of the victim's body and used these photographs to illustrate the testimony of the State's witnesses. Having examined the photographs, we are of the opinion that none of them are particularly gruesome or inflammatory. Further, all of the photographs were relevant to illustrate the testimony of the State's witnesses and were not excessive or repetitious. Therefore, we cannot say that the trial court's ruling was "so arbitrary that it could not have been the result of a reasoned decision." *Id.* at 285, 372 S.E.2d at 526-27. Consequently, this assignment of error is overruled.

IV.

[4] Defendant next argues that the trial court erred in admitting highly prejudicial hearsay evidence tending to show defendant did not like the fact that the victim would not allow defendant to move in with him. We disagree.

At trial, the State's first witness, Evelyn Respess, was asked whether she had ever had a conversation with the victim about defendant wanting to move into the victim's residence with him. Defense counsel immediately objected on hearsay grounds, but the State countered by arguing that testimony of such a conversation was admissible under the state-of-mind exception to the hearsay rule. The State further proffered that Respess' testimony would demonstrate defendant was upset and angry at the fact the victim would not let him move in. Defendant's objection was overruled, and Respess testified as follows:

Q. What did Wayne [the victim] say to you in the course of this conversation?

A. He said, "Shawn wants to move in here, and I've told him, no, I don't want him to, and he don't like it."

Q. That he, Shawn [defendant], didn't like it?

A. (Witness nods affirmatively.)

Q. Did he tell you he got angry and upset—

MR. HARRELL: Objection. Leading.

THE COURT: Sustained.

Q. Just that he didn't like it.

A. He didn't like it.

Defendant argues that the victim's statement to Evelyn Respess should not have been admitted because the statement is merely a recitation of remembered facts and does not demonstrate the victim-declarant's own state of mind at the time.

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. R. Evid. 801(c) (1999). Under N.C. R. Evid. 802, hearsay is generally not admissible; however, numerous exceptions to this rule exist, including N.C. R. Evid. 803(3), which allows admission of "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition . . . but not including a statement of memory or belief to prove the fact remembered or believed. . . ." N.C. R. Evid. 803(3) (1999). "Such a statement must also be relevant to a fact at issue in the case (Rule 402) and its probative value must not be substantially outweighed by its prejudicial impact (Rule 403)." State v. Jones, 137 N.C. App. 221, 227, 527 S.E.2d 700, 704, disc. review denied, 352 N.C. 153, 544 S.E.2d 235 (2000).

In this case, defendant argues that the victim's statements should not have been admitted because the statements were recitations of remembered facts and not statements about the victim's existing state of mind, emotions, sensation, or physical condition. However, "our courts have repeatedly found admissible under Rule 803(3) a declarant's statements of fact that indicate her state of mind, even if they do not explicitly contain an accompanying statement of the declarant's state of mind." Id.

In State v. Brown, 350 N.C. 193, 513 S.E.2d 57 (1999), our Supreme Court held that a decedent's factual statements about the status of his marriage exposed how he felt about the marriage and were therefore state-of-mind statements, despite the fact that he did

not explicitly state how he felt about the situation. The Court also held that the statements corroborated a possible motive for the defendant's act of murder. Moreover, the decedent's statements in *Brown* rebutted testimony by the defendant that her marriage to the victim was a happy marriage.

In the instant case, the victim's statement that defendant wanted to move in with him, that the victim had told defendant that he did not want defendant to move in, and that defendant did not like it, are arguably no more than recitations of fact. However, as in *Brown*, these facts tend to show the victim's state of mind as to his relationship with defendant and were therefore admissible under Rule 803(3). *See State v. Exum*, 128 N.C. App. 647, 655, 497 S.E.2d 98, 103 (1998) (noting with approval that fact-laden statements are usually purposeful and deliberate expressions of some state of mind). Specifically, these facts tend to show that the victim did not want defendant to move in with him, and that the victim was aware that defendant did not like that fact. Further, since the victim's statements shed light on his relationship with defendant, they were relevant under Rule 402. *See State v. Scott*, 343 N.C. 313, 335, 471 S.E.2d 605, 618 (1996) ("It is well established in North Carolina that a murder victim's statements falling within the state of mind exception to the hearsay rule are highly relevant to show the status of the victim's relationship to the defendant."). Finally, the statements rebutted defendant's claim in his confession that he and the victim were not having any type of disagreement or argument prior to the night of the victim's death. Therefore, this assignment of error is overruled.

V.

**[5]** Defendant next argues that the trial court erred in denying his motions to dismiss made at the close of the State's evidence and at the close of all the evidence. First, defendant contends that there was insufficient evidence of premeditation and deliberation to support first degree murder based on premeditation and deliberation. Second, defendant contends there was insufficient evidence of felony murder, in that (1) the only evidence of robbery, the underlying felony upon which the felony murder conviction was based, was defendant's extrajudicial confession, and (2) the evidence was insufficient to show that the victim's death and the taking of the victim's property were part of a continuous transaction. We disagree.

In ruling on a motion to dismiss on the ground of insufficiency of the evidence, the trial court must determine whether there is sub-

stantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense. *State v. Crawford*, 344 N.C. 65, 73, 472 S.E.2d 920, 925 (1996). "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Id.* "If there is substantial evidence-whether direct, circumstantial, or both-to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied." *State v. Locklear*, 322 N.C. 349, 358, 368 S.E.2d 377, 382 (1988). "In ruling on a motion to dismiss, 'the trial court must consider the evidence in the light most favorable to the State and the State is entitled to every reasonable inference to be drawn from that evidence.' " *Crawford*, 344 N.C. at 73-74, 472 S.E.2d at 926 (quoting *State v. Saunders*, 317 N.C. 308, 312, 345 S.E.2d 212, 215 (1986)).

"First-degree murder is the unlawful killing—with malice, premeditation and deliberation—of another human being." *State v. Arrington*, 336 N.C. 592, 594, 444 S.E.2d 418, 419 (1994); *see also* N.C. Gen. Stat. § 14-17 (1999). "Premeditation means that defendant formed the specific intent to kill the victim for some length of time, however short, before the actual killing." *Id.* "Deliberation means that defendant carried out the intent to kill in a cool state of blood, 'not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation.' " *Id.* (quoting *State v. Hamlet*, 312 N.C. 162, 170, 321 S.E.2d 837, 843 (1984)). "Ordinarily, premeditation and deliberation must be proved by circumstantial evidence." *State v. Saunders*, 317 N.C. 308, 312, 345 S.E.2d 212, 215 (1986).

In determining whether a killing was done with premeditation and deliberation, the following circumstances are to be considered:

> " '(1) want of provocation on the part of the deceased, (2) conduct and statements of the defendant before and after the killing, (3) threats made against the victim by the defendant, (4) ill will or previous difficulty between the parties, and (5) evidence that the killing was done in a brutal manner.' "

*Crawford*, 344 N.C. at 74, 472 S.E.2d at 926 (quoting *State v. Saunders*, 317 N.C. 308, 313, 345 S.E.2d 212, 215 (1986) (quoting *State v. Calloway*, 305 N.C. 747, 751, 291 S.E.2d 622, 625-26 (1982))).

Taken in the light most favorable to the State, the evidence in the instant case tended to show the following: Defendant stabbed the victim in the back, and, upon realizing the victim would die, defendant

stabbed the victim again, this time in the chest. Prior to leaving the victim's home, defendant removed his fingerprints from the sword and every other object he had touched while in the victim's home, and took some marijuana and a smoking pipe belonging to the victim. The victim suffered a shallow stab wound to the left side of the chest, as well as a stab wound to the left side of the back that caused significant damage to the victim's left lung and aorta, and also damaged the victim's diaphragm and liver. The victim also suffered a cut on his right thumb and a fractured rib. There was no evidence that the victim provoked the stabbing. Defendant and the victim had been involved in a homosexual relationship for several years, and the victim had recently rejected defendant's request to move in with the victim, angering and upsetting defendant.

We conclude that the circumstantial evidence in this case, taken as a whole, was sufficient to permit the jury reasonably to infer that defendant murdered the victim with premeditation and deliberation. The other elements of murder being clearly present, the judge did not err in denying defendant's motion to dismiss the charge of murder in the first degree based on malice, premeditation and deliberation.

[6] Defendant also argues that the evidence is insufficient as a matter of law to support his conviction of felony murder because there is no evidence of robbery, the underlying felony upon which the felony murder conviction was based, apart from defendant's extrajudicial confession.

It is settled law in this State that a conviction cannot be sustained upon a naked, uncorroborated extrajudicial confession. *State v. Franklin*, 308 N.C. 682, 690, 304 S.E.2d 579, 584 (1983). There must be independent proof, either direct or circumstantial, of the *corpus delicti* of the crime in order for the conviction to be sustained. *Id.* However, in *Franklin*, the Supreme Court held "that independent proof of the underlying felony in a felony murder prosecution is not necessary where a confession, otherwise corroborated as to the murder, includes sufficient facts to support the existence of the felony." *Id.* at 693-94, 304 S.E.2d at 586.

In the instant case, defendant confessed to stabbing the victim in the back, and, after realizing the victim would die, stabbing him again in the chest. Defendant also confessed to taking the victim's marijuana and smoking pipe. Defendant's confession was corroborated by substantial independent evidence. The State presented evidence of defendant's presence at the victim's home on the morning of the vic-

tim's death, which corroborated defendant's confession concerning his whereabouts during that same time period. The State also presented evidence of the number and location of the victim's stab wounds, the location of the towel, sword, and cover near the foot of the victim's bed, and the absence of defendant's fingerprints in the victim's house; all evidence which corroborated defendant's statement of the stabbing and his actions afterwards. Although there was no independent evidence of armed robbery, the State's evidence provided sufficient corroboration of the victim's murder to make defendant's entire confession trustworthy. Therefore, defendant's confession is sufficient evidence of felony murder if, as the State contends, the victim's death occurred during the perpetration of robbery.

"A murder . . . which shall be committed in the perpetration or attempted perpetration of any . . . robbery . . . shall be deemed to be murder in the first degree . . . ." N.C. Gen. Stat. § 14-17 (1999). "The evidence is sufficient to support a charge of felony murder based on the underlying offense of armed robbery where the jury may reasonably infer that the killing and the taking of the victim's property were part of one continuous chain of events." *State v. Handy*, 331 N.C. 515, 529, 419 S.E.2d 545, 552 (1992).

> "Where there is a continuous transaction, the temporal order of the killing and the taking is immaterial. Provided that the theft and the killing are aspects of a single transaction, it is immaterial whether the intent to commit the theft was formed before or after the killing."

*State v. Morganherring*, 350 N.C. 701, 734, 517 S.E.2d 622, 641 (1999), *cert. denied*, 529 U.S. 1024, 146 L. Ed. 2d 322 (2000) (quoting *State v. Handy*, 331 N.C. 515, 528, 419 S.E.2d 545, 552 (1992)).

Here, the evidence shows that upon stabbing the victim, defendant immediately grabbed a towel and began trying to remove his fingerprints from anything he had touched. Defendant then took the victim's marijuana and smoking pipe, which defendant had been using, and left the victim's house. There was no evidence that defendant left the victim's house after the stabbing and returned later to steal the victim's property. Based on this evidence, a reasonable juror could infer that defendant's murder and subsequent robbery of the victim were all part of one transaction. Therefore, there was sufficient evidence of armed robbery to support the felony murder charge in this case.

VI.

[7] In the instant case, the trial court submitted the following possible verdicts: guilty of first degree murder on the basis of malice, premeditation and deliberation; guilty of first degree murder under the felony murder rule; guilty of second degree murder; and not guilty. The jury found defendant guilty of first degree murder on the basis of malice, premeditation and deliberation, and under the felony murder rule. Defendant assigns error to the trial court's failure to submit the lesser included offense of voluntary manslaughter, arguing the evidence supported a finding that defendant did not act with malice.

"Voluntary manslaughter occurs 'when one kills intentionally but does so in the heat of passion suddenly aroused by adequate provocation or in the exercise of self-defense where excessive force is utilized or the defendant is the aggressor.'" *State v. Jarrett*, 137 N.C. App. 256, 263, 527 S.E.2d 693, 698, *disc. review denied*, 352 N.C. 152, 544 S.E.2d 233 (2000) (citation omitted). However, "[a]ny error in the trial court's failure to instruct on voluntary manslaughter was rendered harmless by the jury's verdict finding that defendant had acted with malice, premeditation and deliberation." *Id.* "The finding of premeditation, deliberation and malice required for a first-degree murder conviction precludes the possibility of the same jury finding the defendant guilty of a lesser manslaughter charge." *Id.* (quoting *State v. Exxum*, 338 N.C. 297, 301, 449 S.E.2d 554, 556 (1994)). Therefore, this assignment of error is overruled.

VII.

[8] In his final assignment of error, defendant argues that the trial court committed plain error in failing to intervene *ex mero motu* when the prosecutor argued to the jury that "the State of North Carolina is each and every one of you," in that this put the jurors in an adversarial role instead of an impartial one. We disagree.

During his closing argument, the prosecutor told the jury:

Now, one of the things that Judge Tilghman will tell you is that the burden of proof in this case is on the State, or on the people of North Carolina, really, if you will, because you must first I think ask yourself who is the State of North Carolina. Is it me? Am I the State? Jim Hunt, is he the State? Jim Martin before him? No. I submit to you that the State of North Carolina is each and every one of you and the rest of your friends and neighbors in this county

and the other counties throughout this state. Maybe we ought to refer to the case as <u>People versus Maechel Shawn Patterson</u>.

Defendant contends that this argument impermissibly placed the jury in an adversarial role against defendant.

We begin by noting that prosecutors are generally granted wide latitude in the scope of their argument, and the conduct of the arguments of counsel is generally left to the sound discretion of the trial judge. *State v. Small,* 328 N.C. 175, 400 S.E.2d 413 (1991). "In order for defendant to be granted a new trial, the error must be sufficiently grave that it is prejudicial." *Id.* at 185, 400 S.E.2d at 418 (quoting *State v. Britt,* 291 N.C. 528, 537, 231 S.E.2d 644, 651 (1977)). Further, the North Carolina Supreme Court has said that " 'the impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it.' " *State v. Gell,* 351 N.C. 192, 211, 524 S.E.2d 332, 345, *cert. denied,* 531 U.S. 867, 148 L. Ed. 2d 110 (2000) (quoting *State v. Johnson,* 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979). Thus, "[i]n order to establish that the trial court abused its discretion by failing to intervene *ex mero motu,* a 'defendant must show that the prosecutor's comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair.' " *Id.* (quoting *State v. Davis,* 349 N.C. 1, 45, 506 S.E.2d 455, 467 (1998), *cert. denied,* 526 U.S. 1161, 144 L. Ed. 2d 219 (1999)). Defendant has not done so in this case.

Defendant argues that, by equating the members of the jury to the State of North Carolina, the prosecutor severely prejudiced defendant by aligning the jurors with the State and against defendant. However, the courts of this State have repeatedly stated that it is proper to urge the jury to act as the voice and conscience of the community. *See State v. Locklear,* 349 N.C. 118, 153, 505 S.E.2d 277, 297 (1998), *cert. denied,* 526 U.S. 1075, 143 L. Ed. 2d 559 (1999); *State v. Bishop,* 346 N.C. 365, 396, 488 S.E.2d 769, 786 (1997). Therefore, defendant's final assignment of error is overruled.

For the foregoing reasons, we conclude that defendant received a fair trial, free from prejudicial error.

No error.

Judge McGEE concurs.

STATE v. PATTERSON

[146 N.C. App. 113 (2001)]

Judge GREENE concurs in the result with a separate opinion.

GREENE, Judge, concurring in the result.

I believe (I) the killing and robbery of the victim did not form one continuous transaction, and it was therefore error to submit a felony murder instruction to the jury; (II) the testimony of Respess regarding the victim's statements to her was inadmissible hearsay; and (III) neither of these errors require a new trial. As I otherwise fully concur with the majority, I join the majority in affirming Defendant's conviction for first-degree murder.

I

Our statutes specifically provide that a murder "committed in the perpetration . . . of . . . robbery . . . shall be deemed to be murder in the first degree." N.C.G.S. § 14-17 (1999). This is commonly known as the felony murder doctrine and traditionally required the homicide occur subsequent to or during the commission of the underlying felony. *See* 40 Am. Jur. 2d *Homicide* § 67 (1999) (death must "be caused by an act in [the] course of or in furtherance of the [underlying] felony"); *State v. Squire*, 292 N.C. 494, 511, 234 S.E.2d 563, 573 (there must be no break in the chain of events leading from the initial felony to the act causing death), *cert. denied*, 434 U.S. 998, 54 L. Ed. 2d 493 (1977). Although the original rationale for the felony murder doctrine remains intact, *State v. Richardson*, 341 N.C. 658, 666, 462 S.E.2d 492, 498 (1995) ("to deter . . . killings from occurring during the commission of . . . a dangerous felony"), our courts have more recently held "the temporal order of the killing and the felony is immaterial" and neither does it matter that the intent to commit the felony may have been formed after the killing, provided the killing and the commission of the felony constitute one continuous transaction, *State v. Roseborough*, 344 N.C. 121, 127, 472 S.E.2d 763, 767 (1996). The two events are not considered continuous if there is any "break in the chain of events." *State v. Handy*, 331 N.C. 515, 529, 419 S.E.2d 545, 552 (1992).

In this case, the evidence, considered in the light most favorable to the State, reveals defendant, some thirty minutes after he killed the victim and attempted to clean his fingerprints from the premises, picked up the box of marijuana and smoking pipe as he was leaving the house. There is no evidence defendant formed his intent to take the items before the murder. The intent was formed just as he was leaving the premises some thirty minutes after the killing and after

defendant sought to remove his fingerprints from the premises and, thus, does not constitute a taking occurring as part of a single transaction beginning with the killing of the victim. *See State v. Powell*, 299 N.C. 95, 102, 261 S.E.2d 114, 119 (1980) (taking of property was an "afterthought" and did not constitute a "continuous chain of events"). To hold otherwise in this case would be an abuse of the felony murder doctrine and this type of abuse, if sanctioned by the courts, could lead to its abrogation. *See* 2 Charles E. Torcia, *Wharton's Criminal Law* § 149, at 306 (15th ed. 1994) (felony murder doctrine eliminated in England and limited in some United States jurisdictions). The trial court thus erred in submitting a jury instruction on felony murder.

## II

"Evidence tending to show the victim's state of mind is admissible [as an exception to the hearsay rule] so long as the victim's state of mind is relevant to the case at hand." *State v. Stager*, 329 N.C. 278, 314, 406 S.E.2d 876, 897 (1991). Evidence of the victim's state of mind includes evidence indicating "the victim's mental condition by showing the victim's fears, feelings, impressions or experiences." *State v. Walker*, 332 N.C. 520, 535, 422 S.E.2d 716, 725 (1992), *cert. denied*, 508 U.S. 919, 124 L. Ed. 2d 271 (1993). However, statements relating only factual events and "made in isolation, unaccompanied by a description of [the victim's] emotion[s]," generally fall outside the scope of Rule 803(3). *State v. Lathan*, 138 N.C. App. 234, 240, 530 S.E.2d 615, 621, *disc. review denied*, 352 N.C. 680, 545 S.E.2d 723 (2000).

In this case, the testimony of Respess was unaccompanied by descriptions of the victim's emotions or mental state and instead reflected only *defendant's* mental state. Thus, it was error for the trial court to admit these statements into evidence.

## III

The error in submitting the felony murder instruction does not require a new trial because I agree with the majority there was sufficient evidence to support the jury's alternative determination defendant was guilty of first-degree murder on the basis of premeditation and deliberation. *See State v. Green*, 321 N.C. 594, 606, 365 S.E.2d 587, 594, *cert. denied*, 488 U.S. 900, 102 L. Ed. 2d 235 (1988).

The error in allowing Respess to offer her testimony about the comments of Andrews does not entitle defendant to a new trial as he was not prejudiced by their admission. Defendant argues he is entitled to a new trial because without the testimony of Respess there is

no showing Defendant had a motive for the killing. The State, however, was not required to develop a motive as there was undisputed evidence defendant killed the victim. *See State v. Heavener,* 298 N.C. 541, 548, 259 S.E.2d 227, 231 (1979) (the State is not required to establish motive to prove guilt of first-degree murder).